UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPYGLASS CAPITAL PARTNERS, L.P | § | |
| A Nevada Limited Partnership | § | |
| | § | |
| Plaintiff | § | CIVIL ACTION |
| | § | NO. 4:07-cv-03478 |
| | § | |
| Vs. | § | |
| | § | PLAINTIFF'S FIRST |
| | § | AMENDED ORIGINAL |
| STEPHEN X. KIM and FRED NOLTE | § | COMPLAINT |
| | § | |
| Defendants | § | |
| | § | JURY DEMANDED |

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Spyglass Capital Partners, L.P., Plaintiff, and files its First Amended Original Complaint and Jury Demand, complaining of Stephen X. Kim and Fred Nolte, Defendants, and for causes of action would show the Court and jury the following:

No leave of court is required because no defendant has yet filed a responsive pleading. Defendant Kim's motion to dismiss is not a responsive pleading as defined in Federal Rule of Procedure 7(a), and a party may amend its pleadings once as a matter of course anytime before a responsive pleading is served pursuant to Federal Rule of Civil Procedure 15(a).

NATURE OF THE CASE

1.      This is a securities fraud action brought by a limited partnership against its former general partner, seeking to pursue remedies under the Securities Exchange Act of

1934 (the Exchange Act), the Texas Securities Act, and the common law.  The basis of the case is that the Defendant Kim made material misrepresentations and omissions to the investors about his education, qualifications, experience and track record as an investment fund manager, and thereafter once he obtained their money. Defendant Kim induced the investors to purchase securities in Defendant's investment scheme primarily through these misrepresentations about himself. After Defendant obtained the investors' money through this fraud, he lost the majority of the principle through a combination of his own incompetence, inexperience, embezzlement, misappropriation, conversion, breach of fiduciary duty and fraud.  Had the investors known that the Defendant's representations were false, they would not have purchased the securities and would not have sustained their substantial losses, which are in the millions of dollars.

2.     Plaintiffs also bring this action against a beneficiary of the fraud, Defendant Nolte, who is vicariously liable because he knew at the time of his receipt of funds from Defendant Kim that they were obtained through a fraudulent transaction.

JURISDICTION AND VENUE

3.     The federal claims asserted herein arise under and pursuant to 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (SEC) [17 C.F.R. §240.10b-5].

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

5.      This Court has supplemental jurisdiction over the state statutory and common law actions pursuant to 28 U.S.C. §1367(a) because these claims are so related to the federal claims that they are part of the same case or controversy.

6.      This Court has personal jurisdiction over Defendant Stephen X. Kim because he is and was at all relevant times a resident of the State of Texas.

7.      This Court has personal jurisdiction over Defendant Fred Nolte because the defendant's contacts with Texas arise from or are directly related to the Plaintiff's cause of action against him.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b) because the Defendant Kim resides in this District and resided in the District at all times relevant to the lawsuit, and further, many of the acts and omissions complained of herein occurred in substantial part in this District.

9.      In connection with the acts alleged in this Complaint, Defendant Kim, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications.

PARTIES AND NATURE OF THE CLAIMS

10.      Plaintiff is Spyglass Capital Partners, L.P., A Nevada limited partnership (hereafter "Spyglass.")   Spyglass is presently owned by six individuals who purchased limited partnership interests in Spyglass (hereafter "Limited Partners") for their own account or on behalf of related entities.  Individually, these Limited Partners are: (1) Mort Ltd, through Lawnie Sturdevant; (2) Kestrel Capital, LP, through Barrett Webster; (3) M. St. John Dinsmore; (4) Corbin J. Robertson III; (5) James C. Mercer; and (6) John

Reckling.   Kim solicited investment in Spyglass from each of these individuals in Houston, Harris County, Texas.  The limited partnership interests constitute a security as that term is defined under 15 U.S.C. §77b(1).

11.     Defendant is Stephen X. Kim (hereafter "Kim"), a resident of Houston, Harris County, Texas, who can be served with process at 2503 Winrock, Houston, TX 77057.  Defendant was the majority owner and sole manager of Spyglass Holdings, LLC (hereafter "Holding Company"), a Nevada limited liability company.  Said Holding Company is the general partner of Spyglass.  Thus, at all times relevant to this lawsuit, from November 2003 to February 2007, Kim, in his capacity as the manager of Spyglass Holdings, LLC, acted as the general partner of SpyGlass, or acted on behalf of the general partner of Spyglass.

12.     Kim was removed as the manager of the Holding Company in February 2007, upon the discovery of his fraudulent and criminal activity.  The new manager of the Holding Company and a majority of the voting interests in Spyglass have approved this lawsuit against Kim.  This action is therefore brought directly by Spyglass and thus is not a derivative shareholder action or a class action.

13.     Defendant Fred Nolte is a resident of California and can be served with process at 10812 La Batista Ave, Fountain Valley CA 92708.

14.     Spyglass brings this action against Defendant for securities fraud, under 15 U.S.C. § 78j(b) [Section 10(b)] and 17 C.F.R. § 240 [Rule 10b-5]; under Tex. Bus. & Com. Code §27.01, Section 33 of the Texas Securities Act, as well as for common law fraud, embezzlement and breach of fiduciary duty.

4

## SCIENTER AND FRAUD SCHEME

15.     Kim organized Spyglass on November 20, 2003, and set up the Holding Company to serve as the general partner of Spyglass.   Kim controlled the Holding Company from November 2003 until February 2007.

16.     Starting in February 2004 and continuing through May 2005, Kim began using the means and instrumentalities of interstate commerce and the U.S. mail in connection with the sale or offer of securities by sending a Private Placement Memorandum (the "PPM") and a Limited Partnership Agreement, dated February 2004, to potential investors, including the Limited Partners, in order to solicit their purchase of securities in Spyglass.   These solicitations to the Limited Partners occurred in and about Harris County, Texas, at the offices and places of business of the respective Limited Partners, or by telephone.   In particular, Kim made the solicitations, misstatements and omissions to the following people at the following times and places: (1) Lawnie Sturdevant, in January 2004 through March 2004, at Kim's office and by phone; (2) Dean Zarkos, in January 2004 through March 2004, at Zarkos' office and by phone; (3) Barrett Webster, in March 2004 through July 2004, at Webster's office and by phone; (4) Brian McGrath, in March 2004 through July 2004, at the Houstonian Hotel and by phone; (5) Raymond Marchand, in March 2004 through July 2004, at the Office of Mike Osgood and at Marchand's house; (6) St. John Dinsmore, January 2004 through March 2004, at the home of Dinsmore; (7) Corbin Robertson, November 2004 through January 2005, at Robertson's home; (8) James Mercer, July 2004 through December 2004, by phone; and John Reckling, January 2005 through May 2005, at Reckling's office and at Kim's office.

17.     The PPM stated that the primary objective of Spyglass was to maximize capital appreciation and minimize risk by investing in publicly traded securities.   The PPM stated that Spyglass would seek to primarily invest in collateralized mortgage obligations and derivatives of such securities and US Treasury securities, as well as other favorable investment opportunities as the Holding Company might determine.   The PPM proposed that Spyglass would invest in inverse I/O mortgage derivatives. The PPM touted that the majority of the derivative portfolio would be hedged against interest rate risk.

18.     Beginning in February 2004 and continuing through May 2005, Kim solicited and raised over four million dollars in funds from the aforementioned Limited Partners through meetings and PowerPoint presentations with each of the Limited Partners in and about Houston, Texas and Harris County, Texas. During this period of solicitation from February 2004 through May 2005, Kim knowingly made numerous misstatements or omissions of material fact to each of the Limited Partners in the PPM and an accompanying Powerpoint presentation concerning his experience, education, qualifications and track record as an investment manager. Each of the Limited Partners read the PPM prior to making their investments.   These misstatements and omissions of material fact in the PPM were relied upon by each of the Limited Partners in their decision to purchase the securities.   During the same period, Kim also made the same misstatements and omissions of material fact to the Limited Partners in the PowerPoint presentation in order to induce the Limited Partners to purchase the securities, and each

of the Limited Partners relied upon the misstatements and omissions in the PowerPoint presentation in making their decisions to purchase the securities.

19.     The specific misstatements and omissions made by Kim to each of the Limited Partners in the PPM are set out below:

a.      Kim stated in the PPM that he earned a degree in Finance from the University of Texas at Austin.  Kim knew this statement was false.  Kim's degree was in economics, not finance.

b.      Kim stated in the PPM that while attending the University of Texas, he began his career in the financial industry at Merrill Lynch, working as an intern and as an associate.  Kim knew this statement was false.  Kim did not work at Merrill Lynch.

c.      Kim stated in the PPM and PowerPoint Presentation that upon graduation from the University of Texas at Austin, he began his professional career at Lehman Brothers as an institutional and retail broker.  Kim knew this statement was false.  Kim did not work at Lehman Brothers as an institutional and retail broker.

d.      Kim stated in the PPM and PowerPoint presentation that he was a private asset manager with the creation of Skim Management, that he was responsible for actively managing personal and private equity capital for a limited number of investors, and that the investment provided above average returns since its inception.  Kim knew this statement was false.  The returns were not above average, as he claimed, and it was also misleading for Kim to omit that he only managed one individual's account, and did not manage it on an active or full time basis.

e.       Kim stated in the PPM and PowerPoint presentation that he created and opened Westwood Stock Trading, in Westwood, California and claims that the firm was sold within one year to Pro Trader Securities, which was eventually bought by Instinet Corp. in a cash and stock transaction valued at $150 million (INET-Nasdaq).  Kim knew this statement was false. Westwood Stock Trading went out of business and was never sold to Pro Trader Securities or Instinet Corporation, or to any buyer, for any sum of money.

f.       Kim stated in the PPM and PowerPoint presentation that from 1996 to 1999, he actively assisted in the development and testing of three front-end software trading platforms and one ECN (Electronic Communications Network).  Kim claims these were successfully sold to E-Trade (ET-NYSE), Ameritrade (AMTD-Nasdaq), and to Instinet (INET-Nasdaq).  He claims that the ECN, Archipelago, which has partial ownership by Goldman Sachs, JP Morgan, Merrill Lynch, GE, and E Trade, is now responsible for a large portion of the total ECN volume on the NASDAQ and NYSE. Kim knew these statements were false. Kim did not assist in the development of any software trading platforms that were sold to E-Trade, Ameritrade or Instinet.

g.       Kim stated in the PPM and the PowerPoint presentation that he was, at the time, involved in several private equity and venture capital partnerships that are involved in a broad range of industries.  Kim knew these statements were misleading.  Kim omitted from this statement the fact that none of these ventures had brought any products to market, none had earned any returns for the investors, and had kept the bulk of these investment funds for his own benefit.

h.      At the time of Kim's aforementioned meetings with the Limited Partners, starting in February 2004 and continuing through early 2005, Kim represented to each Limited Partner that he had significant personal wealth, and therefore could sustain his standard of living without taking a fee from Spyglass until after Spyglass had returned to each Limited Partner his principal investment in full.  Kim knew these statements were false.  At the time Kim made these statements, Kim had and knew he had little or no income, owed substantial back taxes to the IRS, had a significant amount of personal and consumer debt, and had little or no personal assets.

20.      Kim made these misstatements and omissions to each Limited Partner, and each Limited Partner relied upon these misstatements in making the decision to purchase the securities.  In the aforementioned PPM and PowerPoint presentation, Kim stated that he would be the "Chairman" and "Chief Investment Officer" of Spyglass and he identified no other individuals who would be involved in the decision making and management of Spyglass.  Kim was thus the "brains" of the venture, and his stated credentials, education, experience and track record as an investment manager were critical and material matters.  The Limited Partners were persuaded to purchase the securities primarily on the basis of Kim's aforementioned misstatements and omissions concerning his education, experience, investment management credentials and investment track record.

21.      Between September 1, 2004 and January 31, 2005, Spyglass received investments totaling approximately $4,180,100 from the Limited Partners.  All of these

investments by the Limited Partners were made in reliance on the aforementioned misstatements and omissions made by Kim.

22.     From the period of October 1, 2004 until his removal as manager, Kim caused Spyglass to lose $1,997,251.74 through his incompetence in trading, and caused Spyglass to lose $526,550.00 through Kim's breach of his promise to hedge the investments.

23.     Although Kim caused Spyglass to lose nearly all of its initial investment within a very brief period of time, Kim continued to attempt to raise investment capital from the Limited Partners by making claims to each of them in personal meetings and in investor reports that Spyglass was doing well and that the market environment was ripe for an investment in Spyglass.  Kim admitted in an affidavit dated February 10, 2007 that he made these misrepresentations to the Limited Partners from time of the formation of Spyglass through the present.  A true and correct copy of the Affidavit of Steve X. Kim is attached and is incorporated by reference as Exhibit 1.

24.     Starting in the third quarter of 2004, Kim produced quarterly investor reports for each Limited Partner and continued sending them sporadically to investors until late 2006. Each of the investor reports concealed the correct value of the partner's present investment balance and concealed the ongoing losses.

25.     For the 2004 tax year, Kim produced a year end summary of the performance and valuation of Spyglass. He engaged a CPA to file the Spyglass 2004 IRS Form 1065 and issued K-1 statements to each investor. Unbeknownst to the CPA, Spyglass did not earn any income, as reported to each of the Limited Partners, but instead

produced significant losses in 2004. Spyglass has failed to file any further tax returns since 2004 although the present management is presently endeavoring to do so.

26.     Beginning in early 2005, Kim began returning funds to the Limited Partners, claiming to each of them that Spyglass was achieving its strategy of returning capital as anticipated and was profitable. In fact, Kim was using new investment funds to give the Limited Partners a return under a classic "Ponzi" scheme.

27.     Throughout 2005 and 2006, Kim continued sending the Limited Partners quarterly statements with inflated valuations.  For the 2005 tax year, Kim falsely issued K-1s to the Limited Investors, showing little or no income for Spyglass when in fact Spyglass had significant losses.  No tax return was ever filed for 2005 nor were the K-1s filed with the IRS.

28.     Beginning in 2005 through 2007, Kim began seeking to earn finder's fees by transacting with medium to large oil companies. Beginning in early 2006, Kim completely focused his attention on the oil industry, and completely neglected the management of Spyglass's investments, although he continued with his pattern of misrepresentations to the Limited Partners.

29.     On or about November 25, 2006, Kim finally produced statements to each of the Limited Partners showing that Spyglass had an equity balance of only $1.9 million, which was about 60% of the initial value of the fund and also considerably less than what Kim had been representing to the Limited Partners. Also, this balance was all in cash and

not in the investments that Kim had proclaimed to the Limited Partners in their quarterly investor letters.

30.     Three Limited Partners requested a return of their investment balance in December 2006. Kim stated to them that instead of returning 60% of their initial investment, he would seek to obtain a loan from a personal friend to purchase each Limited Partners' interests at their original investment value less any distributions they earlier received. Kim told the Limited Partners that he would have the funds before the end of the year. Kim executed a purchase agreement with each Limited Partner and issued three Limited Partners personal checks for their investment.

31.     In early January 2007, three Limited Partners deposited their checks and the checks were returned for insufficient funds.  Kim apologized to the three Limited Partners and issued replacement checks, stating that he would have the funds before January 15, 2007.   Kim did not keep this promise.

32.     In late January 2007, Kim produced to each of the Limited Partners what he purported was an online bank statement from Chase Bank showing a balance of $1.9 million.  In fact, by this time, Kim he had lost the entire fund assets and only $1,000 remained in the Spyglass accounts. Kim admitted in January 2007 that all of the Statements that were earlier produced and the Chase Bank online printout were forgeries. Kim denied at that time that he ever stole any of the Spyglass funds.

33.     In fact, beginning in February 2005, Kim began transferring funds from Spyglass to his personal account, for his own benefit. These funds were not earned by Kim or owed to Kim under his contract with Spyglass or under any equitable theory.  The

12

terms of the Spyglass partnership agreement stated that Kim was to earn no fees until all of the Limited Partners had first received the return of their initial investment.   This condition precedent never occurred, and in fact, at the time of these transfers, Kim had already caused Spyglass to lose substantial sums.

34.   Kim's transfer of funds from Spyglass to his personal account constituted fraud and theft.  Kim has stolen at least $1,439, 015.37 from Spyglass.

35.   By June, 2005, Kim began transferring Spyglass funds to Fred Nolte ("Nolte") a California resident.  Kim transferred approximately $1.1 million to Nolte through December 2006.  Kim has admitted that he transferred these funds to Nolte for Nolte to make improvements to a Laguna Beach, California residence in order to sell it and to receive a share of the gains.   Kim also transferred funds on Nolte's behalf to offshore jurisdictions in order for Nolte to purchase a bar in Brazil. By these actions, Kim was hoping to recover some of the losses he had caused through his incompetent trading activities and thereby conceal from the Limited Partners the extent of the losses he had caused due to this incompetence, inexperience, lack of qualifications and theft.

36.   Fred Nolte knew that Kim had committed this fraud upon Spyglass.  At the time of the transfer by Kim to Nolte, Nolte knew that Kim had lost investment funds of Spyglass.  Nolte had, prior to this transfer, made high interest and usurious personal loans to Kim and knew at the time of the transfer that Kim was insolvent and that the funds he had obtained were through fraud.  Nolte was therefore the wrongful beneficiary of Kim's frauds upon Spyglass and is vicariously liable to Spyglass.

37.     The Limited Partners did not discover these misstatements, omissions, acts and omissions until January 26, 2007, and could not have reasonably discovered these matters before then due to the active concealment of these acts and omissions by Kim. On or about February 10, 2007, Kim admitted in writing and under oath that he had, since the formation of Spyglass on November 20, 2003, repeatedly misrepresented the facts and lied to the Limited Partners, had thwarted the disclosure of the true value of the partnership assets to the Limited Partners, and admitted that none of the Limited Partners had any prior knowledge of his misrepresentations, lies, omission or fraudulent actions as it relates to any of his activity or actions relating to Spyglass.  A true and correct copy of the Affidavit of Steve X. Kim is attached and is incorporated by reference as Exhibit 1.

FIRST CLAIM FOR RELIEF

Misstatement or Omission Claim Under Rule 10b-5(b)

38.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

39.     As set forth in Paragraph 19, above, beginning in February 2004 and continuing through May 2005, Kim made serious misstatements or omissions of material fact to each of the Limited Partners in the PPO and PowerPoint presentation concerning his qualifications, experience, education, credentials and track record as an investment manager.

40.     As set forth in Paragraph 19, Kim made these misstatements or omissions of material fact to the Limited Partners in connection with the purchase or sale of securities, in the form of limited partnership interests in Spyglass.

14

41.     Kim made the misstatements and omissions set forth in Paragraph 19 with scienter.  Kim knew that his statements to the Limited Partners about his own credentials, education, experience and track record as an investment manager were a fabrication, were blatantly false, misleading and contained material omissions of fact.  Kim was motivated to make these misstatements and omissions because Kim knew that if had he told the Limited Partners the truth about himself, none of them would have invested in his venture, Spyglass.   Kim thus benefited in a concrete and personal way from these misstatements and omissions, in that he obtained access to millions of dollars in investment funds that he otherwise would not have been able to access.

42.     On February 10, 2007, Kim admitted in writing and under oath that he had, since the very formation of Spyglass, "misrepresented, lied, misled, omitted the disclosure of information, and otherwise thwarted the disclosure of the true value of the Partnership assets and the value of each investor's balances to the Parties and others." *See* Exhibit 1.

43.     Kim made these misstatements or omissions of material fact to induce the Limited Partners to purchase the securities.

44.     Kim's conduct in making these misstatements and omissions to the Limited Partners caused the Limited Partners to purchase securities in Spyglass.

45.     The Limited Partners' reliance on these misstatements and omissions was the proximate cause of their injuries, losses and damages.  But for these misstatements and omissions, the Limited Partners would not have purchased the securities and would not have lost their investments due to the incompetence and fraudulent conduct of Kim.

15

46.     As described above in Paragraph 19, Kim: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Limited Partners to induce them to purchase securities which they otherwise would not have purchased had they known the truth regarding Kim's education, experience, qualifications, credentials and track record as an investment manager.  Kim thereby violated §10(b) of the Exchange Act and Rule 10b-5.

47.     As a direct and proximate result of Kim's wrongful conduct, the Limited Partners suffered damages in connection with the purchase of the securities and is entitled to recover these damages from Kim.

SECOND CLAIM FOR RELIEF

<u>Market Manipulation Claim under Rule 10b-5(a) and (c)</u>

48.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

49.     The Limited Partners were injured in connection with their purchase of the securities by relying upon a market for securities that was controlled or artificially affected by Kim's deceptive or manipulative conduct, as set forth in Paragraph 19 above. But for Kim's misrepresentations, omissions in connection with the sale and purchase of the securities, there would have been no market for the securities, and only by these means was Kim able to manipulate and deceive the Limited Partners into purchasing the securities.  Furthermore, but for Kim's deceptive and manipulative conduct in concealing

16

the ongoing losses and embezzlement, there would have been no market for the securities and the Limited Partners would not have purchased the securities or allowed Kim to continue to continue to lose and embezzle the funds of the limited partnership.

50.     Kim engaged in this manipulative conduct with scienter.  Kim knew his statements to the Limited Partners concerning his education, experience, credentials and investment track record were false, and has admitted in an affidavit, dated February 10, 2007 that "[s]ince the Formation date until present date, I misrepresented, lied, mislead, omitted the disclosure of information, and otherwise thwarted the disclosure of the true value of the Partnership assets and the value of each investor's balances to the Partiesa and others."

51.     By these admitted acts of manipulation, Kim thereby violated §10(b) of the Exchange Act and Rule 10b-5(a) and 10b-5(c).

52.     As a direct and proximate result of Kim's wrongful conduct, Spyglass suffered damages in connection with the purchase of the securities and is entitled to recover its damages from Kim.

THIRD CLAIM FOR RELIEF

Conversion

53.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

54.     Kim solicited over four million dollars from the Limited Partners, and these funds belonged solely to Spyglass.  These funds were the personal property of Spyglass and were a specific chattel of Spyglass, in that the funds were delivered by the Limited

17

Partners to Spyglass for safekeeping, were intended to be kept segregated, substantially in the form in which they were received or in an intact fund, and were not subject to a title claim by Kim.

55.     Kim wrongfully exercised dominion or control over the aforesaid property of Spyglass by transferring the funds to Defendant Nolte and to himself.

56.     Kim's conversion of the personal property of Spyglass is the proximate and actual cause of damages to Spyglass.

FOURTH CLAIM FOR RELIEF

Breach of Contract

57.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

58.     Kim, as a member and the sole manager of the Spyglass Holdings, LLC, which was the general partner of Spyglass, was bound by the contractual agreements entered into between Spyglass and the Limited Partners, and specifically, the November 20, 200 Limited Partnership Agreement of Spyglass Capital Partners, L.P.(hereafter the "LPA") and the February 2004 Private Placement Memorandum ("PPM").  The LPA and the PPO constitute valid, enforceable contracts.

59.     Kim breached said contracts by transferring or using the funds of Spyglass for his own personal use, by transferring funds to Defendant Nolte, and by paying himself fees which he had not earned and which he was not entitled to receive under the LPA or the PPM.

60.     Kim also breached said contracts by failing to invest the funds of Spyglass in a manner that would be hedged against increases in interest rates and otherwise invest the funds in low risk investments, contrary to the promises and agreements made by Kim in the PPO.

61.     Under the PPO, Kim was not to receive management fees for investments under the Collateralized Mortgage Obligation until after the return of the Limited Partner's initial investment.  Kim breached this contract by paying himself management fees even as Spyglass was losing substantial sums and had not returned the Limited Partners initial investment.

62.     Kim's aforementioned breaches of contract were material in that they caused Spyglass to lose substantially all of its funds.

63.     The Limited Partner's damages are a natural, probable and foreseeable consequence of Kim's breach.

64.     The Limited Partners have fully performed their obligations under the contracts, or in the alternative, are excused from their contractual obligations because of Kim's breach.

65.     All conditions precedent to Plaintiff's claim for relief have been performed or have occurred.

66.     Plaintiff is entitled to recover attorney's fees under Texas Civil Practice and Remedies Code chapter 38 because this is a suit based upon breach of a written contract, Plaintiff made demand upon Kim before it filed suit, and Kim did not tender the amount owed within 30 days of the date the claim was presented.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 33 of the Texas Securities Act

67.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

68.     As set forth in Paragraph 19 above, Kim knowingly provided false information to the Limited Partners concerning his education, experience, credentials and track record as an investor, with the intention of inducing the Limited Partners to purchase the securities, and knowing that the Limited Partners would rely upon this materially false information.  As set forth in Paragraphs 20 though 37, he also concealed from the Limited Partners the ongoing losses caused by his incompetence and failure to hedge the funds as promised.  In addition, he stole funds from Spyglass.

69.     These actions constitute a violation of Section 33 of the Texas Securities Act.  These violations were the direct and proximate cause of Plaintiff's damages and Kim is liable to Plaintiff for its losses.

70.     Plaintiff Spyglass was required to hire Anderson M. Simmons, the undersigned attorney, to prosecute this action.  Under the terms of the Texas Securities Act, Spyglass is entitled to recover reasonable and equitable attorney's fees.

## SIXTH CLAIM FOR RELIEF

### Theft Liability Act

71.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

20

72.     Kim, in his capacity as the manager of Spyglass Holdings, LLC, was a fiduciary of Spyglass Holdings, LLC.  Spyglass Holdings, LLC was the general partner of Spyglass and was therefore also a fiduciary of Spyglass, as those terms are defined under Texas Penal Code § 32.45(a)(1).  Kim himself, however, was not the partner of Spyglass.  As such, he never personally held title to any property of Spyglass.

73.     Kim unlawfully appropriated the property of Spyglass with the intent to deprive the Limited Partners of their property when he transferred the funds of Spyglass to his own accounts and to Defendant Nolte without the effective consent of the Limited Partners.  Such conduct constitutes theft as defined in Texas Penal Code § 31.03(b)(1).

74.     Pursuant to Tex.Civ.Prac. & Rem. Code § 134.003, a person who commits theft is liable for the damages resulting from the theft.  Therefore, Kim is liable to Plaintiff Spyglass for the funds and money he unlawfully appropriated from it.

75.     Pursuant to Tex.Civ.Prac.& Rem. Code § 134.005, Plaintiff is entitled to recover its actual damages resulting from Kim's theft and reasonable and necessary attorney's fees.

SEVENTH CLAIM FOR RELIEF

Breach of Fiduciary Duty

76.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

77.     Kim was the general partner in the limited partnership, Spyglass Capital Partners, L.P. ("Spyglass").

21

78.     As the general partner, Kim owed the Limited Partners the same fiduciary duties that a trustee owes to the beneficiaries of a trust, including the use of skill and prudence that an ordinary, capable and careful person would use in the conduct of his own affairs, and the duty to make the assets of the trust productive while at the same time preserving the assets, as required under Texas Property Code § 113.051 et seq.   Kim breached these fiduciary duties by engaging in risky, speculative investments without the education, experience and other investment credentials necessary to manage such investments.

79.     Through the aforementioned misstatements, acts, omissions, embezzlement an fraud, Kim breached each of his statutory and common law fiduciary duties owed to the Limited Partners, including the duty of loyalty and utmost good faith, the duty of candor, the duty to refrain from self-dealing, the duty to act with integrity of the strictest kind, the duty of fair and honest dealing, and the duty of full disclosure.

80.     Kim's breach of his fiduciary duties to the Limited Partners was the direct and proximate cause of their actual economic damages and Plaintiff is entitled to recover its actual damages, punitive damages and equitable attorney's fees from Kim.

EIGHTH CLAIM FOR RELIEF

Common Law Fraud

81.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

82.     Kim made the numerous representations, as set forth in Paragraph 18 above, to the Limited Partners in connection with their purchase of the securities.

22

83.     The representations made by Kim to the Limited Partners, with regard to his education, experience, qualifications, credentials and track record as an investment manager were material.

84.     Kim also made numerous representations to the Limited Partners concerning the value of the partnership assets after the Limited Partners had purchased the securities.

85.     These representations were false and Kim knew the representations were false when he made them.  Kim has admitted that he made misrepresentations to the Limited Partners and that the falsity of these representations was not known to the Limited Partners at the time.

86.     Kim made the representations with the intention of inducing the Limited Partners to purchase the securities and with the intention that the Limited Partners would rely upon the representations.

87.     Kim also made the later representations with the intention of concealing from the Limited Partners the losses caused by his incompetence, fraud and embezzlement.

88.     The Limited Partners relied upon these representations, and but for the representations, would not have purchased the security interests, and after the fact, would not have allowed Kim to continue as general partner.

89.     The representations were thus the direct and proximate cause of the Limited Partners' economic losses and damages.

NINTH CLAIM FOR RELIEF

<u>Vicarious Liability of Beneficiary of the Fraud</u>

90.     Plaintiff repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

91.     Defendant Fred Nolte benefited from Kim's various fraudulent actions, as set forth above, when Kim wired funds belonging to Spyglass to Nolte.  Nolte has used these funds to improve real property that he owns, for resale, namely 480 Cress Street, Laguna Beach, California.  Nolte knew at the time of the transfer of the funds that Kim had committed fraud upon Spyglass.  Nolte is therefore vicariously liable to Spyglass for the fraudulent acts of Kim, in the amount of the funds transferred to Nolte, which are $1,100,000.00.

<u>TENTH CLAIM FOR RELIEF</u>

<u>Punitive Damages</u>

92.     Spyglass repeats and incorporates by reference each and every allegation contained above as if fully set forth herein.

93.     Spyglass is entitled to recover punitive or exemplary damages from Kim on the grounds of fraud, pursuant to Tex. Civ. Prac. & Rem. Code § 41.003(a)(1).  The wrong done by Kim was aggravated by the kind of fraud for which the law allows the imposition of exemplary or punitive damages, in that Kim made material representations that were false, knowing that they were false or with reckless disregard as to their truth and as a positive assertion, with intent that the representations be acted upon by the Limited Partners.

94.     Plaintiff is entitled to recover punitive or exemplary damages from Kim on the grounds of breach of his intentional breach of his fiduciary duties.

## DAMAGES

95.     By reason of the above and foregoing, and as a direct and proximate result of the acts and omissions complained of herein, Plaintiff has suffered damages well in excess of the minimum jurisdictional limits of this Court, including but not limited to:

a.     actual damages in the amount of $1,439,015.37 lost due to embezzlement and fraud by the Defendant;

b.     actual damages in the amount of $2,523,801 lost due to the incompetence, breach of fiduciary duty and fraud by the Defendant.

c.     exemplary damages as determined by the finder of fact in accordance with the law.

## ATTORNEY'S FEES

96.     Spyglass was required to hire Anderson M. Simmons, the undersigned attorney, to prosecute this action.  Spyglass is entitled to recover from Kim its reasonable and equitable attorney's fees and costs.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be duly cited to appear, answer this complaint, and upon a final trial of this cause, that Plaintiff recover:

a.     Judgment against the Defendant for Plaintiff's economic damages as set forth above, of at least $3,962,817.11;

b.     Judgment against the Defendant for exemplary damages in an amount within the jurisdictional limits of the court;

c.     Prejudgment interest on the Plaintiff's damages as allowed by law;

d.     Interest on said judgment at the legal rate from date of judgment;

e.     Reasonable attorney's fees;

f.     Court costs; and

g.     Such other and further general and specific relief to which Plaintiff may be justly entitled

Respectfully submitted,

Law Office of Anderson M. Simmons, PC


By:  s/Anderson Simmons
      Anderson M. Simmons
      Texas State Bar. No. 24002945
      Southern District Bar. No. 21107
      702 Rio Grande
      Austin, TX 78701
      (512) 499-8688
      (512) 499-8680 fax
      Attorney for Plaintiff

CERTIFICATE OF SERVICE

I certify by my signature below that on November 28, 2007, a true and correct copy of the foregoing was served upon the following counsel of record by electronic filing and by electronic mail:

Jason M. Ross
Curran Tomko Tarksi
2001 Bryan Street, Ste 2050
Dallas, TX 75201
Attorney for Defendant Stephen X. Kim

/s/ Anderson M. Simmons